Filed 2/28/13  P. v. Marks CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY MARKS,<br><br>    Defendant and Appellant. | A133727<br><br>(San Francisco City & County<br>Super. Ct. No. 207095) |

Defendant Anthony Marks appeals from his conviction of second degree murder. He maintains the prosecutor's peremptory challenge to a prospective juror of Samoan descent violated his constitutional rights.  Marks also asserts he was not properly advised of his *Miranda*[1] rights and was questioned after he invoked his right to remain silent.  We find no violation of his constitutional rights, and affirm.

### PROCEDURAL AND FACTUAL BACKGROUND

On March 12, 2008, Joan Wolfe discovered the body of Robin Kent under a makeshift plywood shelter at Fourth and Harrison Streets.  Wolfe and Kent were homeless, and sometimes drank or used crack together.  Wolfe had just purchased some crack, and stopped by to see if Kent wanted to "get high."  She "found her dead."  Wolfe ran to a store to get someone to call the police.

When Jon Smith, a physician with the San Francisco Office of the Chief Medical Examiner, arrived at the scene, he observed injuries on Kent's face, specifically blunt force injuries, consisting of bruises, contusions and lacerations on her face.  In the course

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

of performing an autopsy of Kent's body, Dr. Smith observed "multiple sites of injury, primarily located around the face, head, and neck area." There were hemorrhages and bleeding from the scalp, as well as two head fractures. Some of the injuries were "characterized as a patterned type of injury," which "could be related to the tread of a shoe" and were consistent with someone stomping on Kent's head. The cause of Kent's death was the blunt force injuries to her head and neck.

Police found pieces of plywood board near the body, one of which had writing on it which said "Anthony Marks" and underneath it "Robin Mark, I love you, Robin." On the other side of the board, there was writing that said "Robin, I wanted to say how truly sorry [*sic*] for everything that I did." Police also found a bloody footprint showing a tread pattern on the piece of cardboard on which Kent's body was lying. The tread pattern appeared to match the tread pattern on the soles of shoes Marks was wearing when arrested.

Kent had sexual relationships with a number of men, including Marks. She was addicted to crack, and "went with different guys [who] would get her high." Though Kent was "with" Marks, they had "problems," and were "always fighting."

On January 13, 2008, San Francisco police officers had been dispatched to the corner of Ellis and Taylor Streets, where they found Marks yelling at Kent. Police did not observe any physical injuries on Kent, but she was crying and appeared to be afraid of Marks. Marks told police the incident occurred because Kent "kept cheating on him and he caught her sleeping with another man."

On March 10, 2008, Gilbert Lovato, a homeless man, saw Marks and Kent arguing around Fourth and Folsom Streets. Lovato heard Kent tell Marks to "leav[e] her alone and get away from her. . . ." Lovato then saw Marks hit Kent, "just really boxed her in the back of the head, knocked her down." Lovato called the police from his cell phone. As Marks was walking away, Lovato heard Kent say "when the police come, I'm throwing you in jail." Marks turned around and replied "You know what, bitch. You throw me [in] jail and I'll kill you."

Police arrived, but they gave Kent "a hard time" and would not call paramedics. Kent and Lovato went to different spots to attempt to sleep, but police kept rousting them. Kent told Lovato she was tired and was going to go somewhere where nobody would bother her. She told Lovato she had been camping with Marks on Folsom between Third and Fourth Streets.

A day or two later, Lovato learned Kent was dead. He went to look for Marks around Jones and O'Farrell, "where everybody buys and smokes crack." Marks was there with some other people. Lovato heard someone ask Marks where Kent was, and Marks responded "That bitch is gone. She's dead."

On March 15, 2008, police arrested Marks based on an outstanding warrant for the alleged January 13, 2008, assault on Kent. Before police began questioning him, he spontaneously stated "I know what this is about. It's about my old lady."

At the outset of the videotaped interview, San Francisco Police Inspector Casillas informed Marks of his *Miranda* rights. Marks admitted killing Kent. He did not remember how many times he hit her, but "It was a lot. [¶] . . . [¶] Just everywhere. I just . . . . I went off." He admitted kicking Kent, and seeing blood coming out of her nose and mouth. Marks explained he "was enraged [because Kent] . . . ha[d] really, really mentally hurt me."

Marks was charged with first degree murder. (Pen. Code, § 187, subd. (a).) The jury found him not guilty of first degree murder, but guilty of second degree murder. The court sentenced Marks to a prison term of 15 years to life. This timely appeal followed.

## DISCUSSION

### *The* Wheeler/Batson *Motion*

Marks maintains the court erred in denying his motion under *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005)

3

545 U.S. 162, 165-173, claiming the prosecutor's peremptory challenge of a potential juror who was of Samoan descent violated his constitutional rights.**²**

" ' "Review of a trial court's denial of a [*Batson/Wheeler* ] motion is deferential, examining only whether substantial evidence supports its conclusions.  [Citation.]  '. . . We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]  So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.  [Citation.]' " ' [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 165.)

A " 'prosecutor, like any party, may exercise a peremptory challenge against anyone, including members of cognizable groups.  All that is prohibited is challenging a person *because* the person is a member of that group.' " (*People v. Jones* (2011) 51 Cal.4th 346, 369.)  " 'It is well settled that "[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.  [Citations.]  Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. [Citations.]" ' [Citations.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 447.)

"The law applicable to *Wheeler/ Batson* claims is by now familiar.  'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the

---

**²**  Though defense counsel did not mention *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*), an "objection under *Wheeler* suffices to preserve a *Batson* claim on appeal." (*People v. Lancaster* (2007) 41 Cal.4th 50, 73.)

strikes.  [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' [Citation.]" (*People v. Mills* (2010) 48 Cal.4th 158, 173.)

" ' "[T]he critical question in determining whether [a party] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." [Citation.]  The credibility of a prosecutor's stated reasons [for exercising a peremptory challenge] "can be measured by, among other factors . . . how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." [Citations.]' [Citation.]" (*People v. Cowan*, *supra*, 50 Cal.4th at p. 448.)  " ' "So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.  [Citation.]" ' [Citation.]" (*People v. Jones*, *supra*, 51 Cal.4th at p. 360.)

During voir dire, the court and attorneys asked questions of potential juror A.V., a man of Samoan descent.  A.V. stated he had a good friend who was murdered, and he had "just attended his funeral on Saturday."  His friend was shot in San Francisco, and the perpetrator had not been arrested.  A.V. was raised in the Bayview neighborhood in San Francisco, which he agreed "has a reputation for being a tough neighborhood," and was mostly African-American.  A.V. was not discriminated against in the neighborhood because he was Samoan, but he did have a "[c]ouple" of negative experiences with African-Americans.  He competed in a type of martial arts known as "[c]age fighting."  A.V. testified he was attracted to that sport because "[j]ust growing up in my neighborhood, I always had [to], you know, watch out for me and my brothers.  [¶] . . . [¶] That is probably the only thing I am good at taking care of, my family."  He developed his martial arts skills to protect himself in his neighborhood.  A.V. had seen people "get really hurt" in cage fighting.  In response to the question "How do you deal with that part of it?" he responded  "It's the competition.  I just look at it like that."  A.V. stated he would not resolve other problems in his life with his martial arts skills because "my hands are registered.  So, If I ever got in trouble on the streets, they'd take my

license away. And I wouldn't be able to [cage] fight no more." He did not think his experience as a fighter would have any effect on him as a juror.

After the prosecutor exercised a peremptory challenge to potential juror A.V., Marks's attorney made a *Wheeler* motion. He explained "[A.V.] is Samoan, and that is what he told the court. So, I believe he is a distinguishable racial group. [¶] [T]he panel so far, we don't currently have any African American prospective jurors.[3] And he has, he is the only person, who has had any kind of experiences in African American neighborhoods on this whole jury." The court found A.V. was a member of "a cognizable group" and a prima facie case had been established.

The prosecutor responded he did not think a prima facie showing had been made, but stated the following reasons for challenging A.V.: "You will recall this young man, from a very early age, became part of a martial arts culture. I am concerned that he has become [i]nured to physical violence over his life. [¶] Indeed, as I looked at his right ear, it is significantly deformed from the blows that he has taken over the years in this consensual contact sport. [¶] I am also very concerned that just this past Saturday, I think he said, he'd been at a funeral that stemmed from what I understand to be a gang-related shooting in Bernal Heights. And he indicated that, notwithstanding an arrest, that he regarded the crime as unsolved, and there is, indeed, a second shooter out there in the wind. [¶] And I am kind of concerned that he will take that failure, of law enforcement to have resolved that crime and found his friend's killer, out on Inspector Lynch or [me], during the course of this case."

The trial court stated "I certainly accept those reasons. And I am going to deny [the] motion." Marks's attorney noted there was nothing in the record about the shooting

---

[3] The Attorney General suggests the fact Marks, who is African-American, and the challenged juror "do not share a common race" is one of the "relevant factors" to consider. It is not. " 'The defendant need not be of the same race to object to a prosecutor's race-based exercise of peremptory challenges.' " (*People v. Mills*, *supra*, 48 Cal.4th at p. 173, fn. 2.)

being gang-related, and the court agreed.[4]  The court stated:  "I don't think there was anything about a gang-related shooting.  It was a shooting.  It was in . . . Bernal Heights.  It was his very, very close buddy.  [¶] [Defense Attorney]:  Right.  [¶] [The Court]:  And the perpetrator had not been found.  And he said that it was an unsolved shooting of his friend, a murder of his friend.  [¶] And this is a murder case.  His friend was killed.  He also said that he, the only thing he was good at was martial arts, and that he learned martial arts to take care of his family. . . .  And he implied that the only reason he doesn't use martial arts to take  care of problems any longer is because his hands are registered— the implication being that he uses his hands to take care of other problems.  [¶] And I, even striking the gang-relatedness of the homicide, I think, for all the other reasons stated, I am going to deny your motion."[5]

Assuming without deciding a prima facie case was established, the prosecutor gave a detailed, specific, race-neutral explanation for his challenge of A.V. The stated rationale was credible and reasonable.  Substantial evidence supports the trial court's denial of the *Batson/Wheeler* claim.

### Statement to Police

Marks maintains the court erred in admitting the videotape of his questioning by police.  He claims the police violated his constitutional rights in their interrogation of him following his arrest by failing to properly advise him of his rights under *Miranda*, and continuing to question him after he invoked his right to remain silent.

"As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law

---

[4]  The Attorney General cites to material outside the record regarding this shooting.  The Attorney General did not seek judicial notice of this material, and it is not one of the matters of which judicial notice must or may be taken.  (Evid. Code, §§ 451, 452.)

[5]  Based on the court's ruling, Marks suggests the court engaged in judicial misconduct, claiming "the court wrongly assisted the prosecutor in coming up with other questionable and unsubstantiated reasons to get rid of [A.V.] as a juror."  As the above-quoted portions of the record indicate, Marks's claim is utterly meritless.

7

enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." If the suspect knowingly and intelligently waives these rights, law enforcement may interrogate, but if at any point in the interview he invokes the right to remain silent or the right to counsel, "the interrogation must cease." (*People v. Martinez* (2010) 47 Cal.4th 911, 947, citing *Miranda*, *supra*, 384 U.S. at pp. 474, 479.)

"In reviewing defendant's claim that his *Miranda* rights were violated, we must accept the trial court's resolution of disputed facts and inferences, as well as its evaluation of the credibility of witnesses where supported by substantial evidence. [Citations.] *Miranda* makes clear that in order for defendant's statements to be admissible against him, he must have knowingly and intelligently waived his rights to remain silent . . . . [Citation.] [¶] It is further settled, however, that a suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases. A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the Miranda decision. [Citation.] We have recognized that a valid waiver of *Miranda* rights may be express or implied. [Citations.] A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights. [Citations.] In contrast, an unambiguous request for counsel or a refusal to talk bars further questioning. [Citation.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 667-668.)

Prior to questioning Marks, one officer stated "we really need your help, and we'd like to talk to you about . . . about [Kent] and her life, and . . . ah . . . what kinds of things she did or didn't do. Um . . . you need to understand, but . . . I know this is a hard time for you. It's a hard thing to deal with. But we really need your help and, as I said, you don't need to talk to us, and that basically means that you do have the right to remain

8

silent. Do you understand that?" The second officer asked "Can you tell us?" and the first asked "Did you understand that? You understand you don't have to talk to us . . . that you have the right to remain silent." The second officer stated "You're nodding your head up and down. Does that mean yes?" Marks responded "Okay."

The officer then stated "there are going to be some legal proceedings, and so anything you say may be used against you in court. Do you understand that? I'm sorry, what was that?" Marks responded "Um hmm." The officer clarified "Yes?" and Marks responded "Okay." The officer continued "Um . . .and because there are going to be some court proceedings . . . um . . . or there may be . . . um . . . you know that . . . ah . . . you should know that you have the right to the presence of an attorney, before and during any questioning. Now, do you understand that?" Marks responded "Yeah." The officer continued: "Okay. And finally you should understand that just because, you know, you don't have any money, that's not an impediment, okay? You have the right to an attorney and the government will give you one and if you cannot afford to hire an attorney, one will be appointed for you, free of charge, before any questioning, if you want. Do you understand that?" Marks answered "Um hmm," and the officer asked: "Okay. So I know you nodded your head, yes."

Marks's asserts the "trial court ruled that [his] confession was admissible despite the lack of a specific admonition by the police officers that appellant had the right to silence." There is no requirement the content of *Miranda* warnings be "a virtual incantation of the precise language contained in the *Miranda* opinion. . . . [S]uch a rigid rule was not mandated by *Miranda* or any other decision of this Court, and is not required to serve the purposes of *Miranda* . . . ." (*California v. Prysock* (1981) 453 U.S. 355, 355.) "*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures. The Court in that case stated that '[t]he warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent*, prerequisites to the admissibility of any statement made by a defendant.' " (*Id*. at pp. 359-360, quoting *Miranda*, *supra*, 384 U.S. at p. 476.)

9

The admonitions given by the officers, though not in the precise language of *Miranda*, informed Marks of each *Miranda* right. And, contrary to Marks's assertion, the police officers advised him twice he had "the right to remain silent," and explained further "[y]ou understand you don't have to talk to us." This constituted a "fully effective equivalent" of the *Miranda* admonitions. (*Miranda*, *supra*, 384 U.S. at p. 476.)

Marks also claims, without citation to any authority, the police failed to properly advise him of his right to remain silent because his arrest was only for the previous alleged misdemeanor assault on Kent, and they did not tell him he was a suspect in Kent's murder. The advisements required by *Miranda* do not include a statement regarding what crime police suspect the individual of committing. (See *Miranda*, *supra*, 384 U.S. at pp. 478-479.) "[U]nder *Miranda* the vital question is custody, not whether the investigation has focused on the person interrogated. . . . [I]it is immaterial that the questioning relates to a crime other than the one which triggered the custody and is investigatory as far as that offense is concerned." (*In re James M*. (1977) 72 Cal.App.3d 133, 136-137, citing *Mathis v. United States* (1968) 391 U.S. 1, 4-5.)

Marks next asserts he "tried four times to invoke his right to remain silent, but the officers kept asking him seemingly harmless questions." "While we must review the record and make an independent determination of the question, we, like the United States Supreme Court, may 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." (*People v. Jennings* (1988) 46 Cal.3d 963, 979, citing *Miller v. Fenton* (1985) 474 U.S. 104, 112.)

" 'If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.' [Citation.] 'Whether the suspect has indeed invoked that right, however, is a question of fact to be decided in the light of all the circumstances . . . .' [Citation.] We have also said that ' "[a] desire to halt the interrogation may be indicated in a variety of ways," ' [citation] and that the words used ' "must be construed in context." ' [Citation.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1238 (*Musselwhite*).) Once police obtain a defendant's consent to questioning, however, they are "free to interview defendant until

he exercise[s] his privilege against self-incrimination . [Citation.]  A suspect may do so by '[refusing] to sign a waiver of his constitutional rights[,] . . . [refusing] to continue an interrogation already in progress[,] or . . . [by] [asking] for an attorney.'  [Citations.]  A defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.' "  (*People v. Silva* (1998) 45 Cal.3d 604, 629-630.)

In *Musselwhite*, for example, after waiving his *Miranda* rights the defendant stated " 'I don't know what you, *I don't want to talk about this*.  You all are getting me all confused.  (inaudible)  I don't even know what you're all talking about.  You're getting[,] you're making me nervous here telling me I done something I ain't done.  Kill somebody, come on, give me a break.' "  (*Musselwhite*, *supra*, 17 Cal.4th at p. 1239.)  After the trial court viewed the videotape of the police interview, it concluded there was no evidence defendant was requesting to end the interview.  " 'I don't see any evidence in the way that the defendant was acting or in the way he was responding, that he was asking to end that interview, as far as I was concerned, and when I looked at the tape.  So I don't think that's a request to terminate.' "  (*Id*. at p. 1240.)  Courts have similarly found the following statements were insufficient in context to invoke the right to remain silent:  " 'I don't want to talk about it.' "  (*People v. Williams* (2010) 49 Cal.4th 405, 433; " '[Y]ou're gonna try to con-, now I ain't saying no more.' "  " 'You ain't gonna, no.  I'm not gonna get accused of somethin'.  I love people too much.' "  " 'I wouldn't even hurt a fly . . . I'm sorry, don't say no more.' "  (*People v. Ashmus* (1991) 54 Cal.3d 932, 968-970.)[6]  " 'That's all I want to tell you.' "  (*In re Joe R*. (1980) 27 Cal.3d 496, 516.)

After police advised Marks of his *Miranda* rights and he began answering questions, he stated, not in response to a question:  "All I know is that, the thing is . . . . [¶] [Officer]:  What?  [¶] [Marks]:  I didn't do it.  [¶] [Officer]:  When you say you didn't do it, what do you mean?  [¶] [Marks]:  Because everybody seems to think that I did this, and, I mean, I don't even . . . you know, man, fuck.  I am intoxicated right now.  And I

---

[6] Overruled on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117.

am not up to any . . . as a matter of fact, *I'm not up to any questioning about anything.* Okay? I'm tired. [¶] [Officer]: Um hmm. [¶] [Marks]: I mean, ever since I found out about this, I have not had very much sleep. I am really, really tired. [¶] [Officer]: Um hmm. [¶] [Marks] *There's nothing really that I can do for this.* Okay? [¶] [Officer]: You could tell us what you can tell us about [Kent], and where she stayed, and where she went, and where she got her food, and where she got her money. If she got any dope, where she got it. [¶] [Marks]: Okay, well [¶] . . . [¶] . . . okay. I can tell you that." (Italics added.) Later, police asked "And how would you keep your stuff? In a bag, in a box, in a cart . . . how did you have it?" [¶] [Marks]: I didn't keep it in a cart. [¶] [Officer]: Um hmm. [¶] [Marks]: Okay? And this is just getting ridiculous. *I'm not going to deal with the questioning, okay? Enough is enough.* My stuff was in bags. [¶] [Officer]: Um hmm. [¶] [Marks]: I told you. [¶] [Officer]: Um hmm. [¶] [Marks]: We had a situation where I did it moving. [¶] [Officer]: Um hmm. [¶] [Marks]: Okay. Period. I don't care what anybody thinks anymore, because this is just . . . man, I'm not going to even go through this. *I shouldn't be answering any questions at all*, anyway. Okay. My stuff was in bags. [¶] [Officer]: Um hmm. [¶] [Marks]: Okay? I had a little blue thing where I kept some of my stuff in. [Officer]: Um hmm. [Marks]: Okay? You guys know exactly how my stuff was situated. *I'm not going to deal with this. I'm not going to go through it.*" (Italics added.) After continuing to answer questions and admitting he pushed Kent because he was "pissed off," Marks stated "I mean, this is how this woman . . . you know, *I don't even want to talk about this anymore.* [¶] [Officer]: Well, here's the thing and . . . . [¶] [Marks]: *I don't want to talk about this anymore . . . .* [¶] [Officer]: Alright. [¶] [Marks]: *. . . because she was a nasty person. She . . . she really, really dogged me. Okay? And she has really driven me. I don't want to discuss this anymore*. [¶] [Officer]: See that's . . .that's . . . . [¶] [Marks]: *Because I'm getting angry.* [¶] [Officer]: Well, and I think that's my point. She had the way of pushing people's buttons. [¶] [Marks]: She's very good at it. [¶] [Officer]: And so the question is . . . . [¶] [Marks]: And I'm starting to get angry right now." (Italics added.)

After viewing the videotape recording, the trial found Marks had not invoked his right to remain silent. The trial court found "I think context is everything here. [¶] And the way the defendant continues to respond is extremely important here. And what I saw was a defendant, who was not given any promises, who was not threatened in any way, and who did answer the questions that were asked. His speech didn't appear to be affected in a slurred way. He didn't appear to have trouble understanding. He was not falling asleep at the table or nodding off. He didn't have difficulty expressing himself. At times he was angry, at times he was distraught and emotional, at times he was calm. [¶] He was hyper in the sense the inspector talked about hyper. He was hyper in the sense that he kept wanting to talk. He didn't want to stop talking even when he indicated that maybe he didn't want to talk or go into a certain area."

Mark's statements reflected a desire to avoid talking about Kent's death because it was upsetting to him, and frustration and anger with the officers and the victim. He explained to the officers "I'm not going to sit here and try and run away from the situation . . . but I'm like . . . I'm still in shock and I'm like . . . I didn't know what the hell to do." He repeatedly told officers he had been planning to voluntarily come to the police station that day to talk about Kent's death. In light of our independent review of the videotape and the court's findings, we conclude Marks's statements were not unequivocal invocations of his right to terminate questioning and remain silent.

Marks lastly claims the trial court "effectively negated the application of *Miranda* in this case, just as the Supreme Court did in *Berghuis v. Thompkins* [(2010) 560 U.S. ___, 130 S.Ct. 2250 (*Berghuis*)]."[7] While Marks may disagree with the United States Supreme Court's opinion, we are bound by it. (U.S. Const., art. VI, cl. 2; *Cooper v. Aaron* (1958) 358 U.S. 1, 18.)

---

[7] In *Berghuis*, the court held the defendant did not invoke his right to remain silent by not speaking during two hours and 45 minutes of questioning before responding. (*Berghuis, supra,* 130 S.Ct. at pp. 2257, 2259.)

**DISPOSITION**

The judgment is affirmed.

_____

Banke, J.

We concur:

_____

Marchiano, P. J.

_____

Margulies, J.

14